Plaintiff sued to recover judgment against his employer, Avoyelles Wholesale Grocery Company, Ltd., for compensation at the rate of $9.10 per week for 400 weeks on the theory that on June 11, 1941, while performing the duties of his employment he had an accident from which total permanent disability to perform work of any reasonable character resulted. He alleged that near the time to quit work for the day, while carrying sacks of nitrate of soda weighing one hundred pounds each, from his employer's warehouse to a truck, the strain and physical effort incident thereto produced a hernia of such character to cause the disability upon which alleged. He also alleges: "Your petitioner further shows that on November 29, 1940, he was working for the Avoyelles Wholesale Grocery Company, Ltd., and had been unloading heavy freight from a truck, and jumped down out of said truck and sustained a slight hernia; and petitioner believes and so alleges that the second accident and injury, namely June 11, 1941, was a recurrence or aggravation of the first injury."
The Avoyelles Wholesale Grocery Company, Ltd., hereinafter referred to as the company, and the Employers' Liability Assurance Corporation, Ltd., carrier of compensation insurance protection for the company at time of the accident, were impleaded as defendants. They deny that plaintiff is totally and permanently disabled, but aver that if so disabled as a result of any accident the same did not occur in the course of nor did it rise out of his employment. The insurer further alleged that the policy of insurance issued by it to the company is dated January 1, 1941; was effective from that date only, and, therefore, not within its coverage is any claim or right to workmen's compensation by plaintiff arising prior to that date.
It appears that compensation insurance during the year 1940 was effected with another company.
The demand of plaintiff was rejected and his suit dismissed. After unsuccessful effort to secure a new trial, he appealed.
The trial judge gave written reasons for judgment. He held that the case was not made out; that is, that it was not proven to his satisfaction that the hernia afflicting plaintiff resulted from an accident occurring while he was performing the duties of his employment. *Page 685 
In this court appellees tender and argue but one question. They stand upon the court's conclusion that plaintiff failed to make out his case on the vital question of the time of the accident, if any happened, that produced the hernia.
We have reached the conclusion after diligent study of the testimony that its probative weight is sufficient to establish, and does establish, a prima facie case in plaintiff's favor which has not been overcome by countervailing evidence.
Plaintiff's own testimony regarding the time, place and character of the accident is all we have directly on the subject. In November, 1940, while doing heavy work for the company he felt pain in the right inguinal region so severe that he consulted a physician. Definite evidence of a potential hernia in that side, locus of present hernia, was found by the physician. Plaintiff lost three days from work on account of this condition but after resuming his duties with the company he lost no more time therefrom save a few days in January, although now and then he felt pain and discomfort in said region. Concerning the alleged accident of June 11, 1941, he testified:
"Q. Tell us what you were doing on or about June 11th of this year. A. Loading Nitrate of soda.
"Q. How many pounds? A. One hundred pounds.
"Q. Had you been working for the Avoyelles all the year? A. Yes, sir.
"Q. What happened on the day you were unloading this nitrate? A. The pain hit me down in the lower part of my stomach just about quitting time; it was just about five o'clock. I was by myself, just me and the driver.
"Q. Were you sent to any doctor? A. Not that afternoon.
"Q. Were you sent to the doctor the next day? A. The next day after the next day, I sent word to Mr. Norman what the doctor said, that I had a rupture, and he didn't come and I went to his house.
"Q. You went to Mr. Norman's house? A. Yes, sir.
"Q. What did he do? A. He sent me to Dr. Corkern.
* * * * *
"Q. From January on to the time you were loading this soda did you lose any time? A. Not until that evening it got to hurting so bad I had to quit.
"Q. Just how were you handling this soda? A. They have them in the old warehouse, pick them up and put them on your shoulder and bring them out to the front and put them on the truck.
"Q. How far is the distance from the warehouse to the truck? A. From back there to the front of the truck must be fifty feet.
"Q. Do you have any idea about how many such trips you had made? A. Thirty-nine.
"Q. Were they all loaded? A. Yes, sir, that was all we had in there.
"Q. Was the job complete? A. Yes, sir."
This testimony, if believable, proves that while transferring these one-hundred pound sacks of nitrate, thirty-nine in all, something occurred in the inguinal region which produced a burning sensation therein, a sensation which generally accompanies or follows evolution of a potential hernia into a complete one, commonly referred to as a "rupture", such as now afflicts the plaintiff.
Plaintiff testified that after this experience he felt so badly that he asked the company's manager, Mr. Ray Norman, to drive him to his home. However, Mr. Norman testified that he did not drive plaintiff home because he was sick and also testified that on the trip plaintiff did not mention to him that he had had an accident. This omission, at the least, is singular but it is not improbable that plaintiff, an illiterate negro, thought this experience would be no more serious than that in November previous. Plaintiff says that he was in so much pain the night following the accident that he called Mr. Norman on the `phone to tell him of his condition but as Norman was absent from home he was unable to do so. The following day he summoned a physician. This doctor found that plaintiff had a fully developed indirect inguinal hernia. The omentum had passed down into the scrotum. The hernia was eight inches long and as large as an average sized orange. Plaintiff then contacted Mr. Norman and was instructed to see a physician named by him.
It is conceded that a hernia of the character found by the doctor the day after the alleged accident is wholly disabling, and that since that time plaintiff has been totally unable to do any sort of work of which he otherwise is capable. He has *Page 686 
earned his living by manual labor only and had been in the company's employment for fourteen years. Naturally, it may be inferred that his services during this period had been entirely satisfactory. He is twenty-eight years old.
Mr. Norman, the manager, admitted in his testimony that he told plaintiff about the time suit was filed that one or the other of the insurance companies "ought to pay him compensation".
It is well known that continuous heavy physical work or exercise by one possessing a potential hernia is calculated to aggravate the condition to the degree that the hernia will become complete. For this reason the army and most industrial concerns reject for service a man who is affected with this sort of hernia. Its presence acts as a continuing potential threat to the possessor's ability to perform heavy, strenuous work or service.
It has often been held by this and other courts of the state that some potential or incomplete hernias disable to a sufficient extent to warrant cessation of labor and entitles the individual to payment of compensation until the condition is remedied in some manner.
It is argued that since plaintiff did not suffer from nausea or vomiting at time he says the accident occurred, that no such accident happened. Usually such symptoms are manifested when a hernia becomes complete from straining, etc., but this is not invariably true.
The work plaintiff performed for his employer entailed hard labor and heavy lifting. Continuous strain by lifting and carrying heavy boxes, etc., was his lot. It appears reasonably evident that after the experience in November, 1940, because of heavy work, the hernial condition continuously was aggravated and grew more and more serious until it culminated into the condition found by the doctor on June 12, 1942. The question, therefore, forces itself upon us: When did this latter condition occur? A fair conclusion is that it occurred when and where plaintiff says it did. Surrounding circumstances, early developments and plaintiff's conduct immediately thereafter lend support to the verity of his testimony.
This case falls squarely within the general rule announced in Nickelberry v. Ritchie Grocer Company et al., 196 La. 1011,200 So. 330, 331, and cases therein cited, to-wit: "* * * if excessive heat, or heavy lifting, or straining, although usual and customary, or both, cause or contribute to a physical breakdown, or accelerate its happening, the legal requirements necessary to constitute an accident are present and such cases are compensable."
The present case in principle is not unlike the following: Jackson v. Traveler's Insurance Company et al., 180 La. 43,156 So. 169; Renfrow v. Caddo Parish Police Jury et al., La.App., 155 So. 291; Biggs v. Libby-Owens-Ford Glass Company, Inc., et al., La.App., 170 So. 273.
In the Renfrow case, as reflected from Section 2 of the syllabus, it was held: "Where employee was afflicted with high blood pressure which was aggravated by heavy work required by his employment, injury resulting, while in discharge of duties, from blood vessels of eye bursting and causing loss of sight held compensable as `arising out of employment,' regardless of whether injury was result of an unusual strain (Act No. 20 of 1914 as amended)."
Plaintiff also sued to recover judgment for $250 for medical expenses. No proof was submitted to sustain his claim in whole or part.
For the reasons herein assigned, the judgment appealed from is reversed, annulled and set aside, and there is now judgment in favor of plaintiff, Jesse Elmore, and against defendants, Avoyelles Wholesale Grocery Company, Ltd., and the Employers' Liability Assurance Corporation, Ltd., in solido for compensation at the rate of $9.10 per week for the duration of plaintiff's disability not exceeding, however, 400 weeks, the first of said payments being due and payable on June 18, 1941, together with legal interest on any and all past-due payments from that date, and costs. *Page 788